THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
October 30, 2009

Oral Hearing:
July 28, 2009

**UNITED STATES PATENT AND TRADEMARK OFFICE**

‾‾‾‾‾‾

**Trademark Trial and Appeal Board**

‾‾‾‾‾‾

Christopher Brooks
v.
Creative Arts By Calloway, LLC

‾‾‾‾‾‾

Opposition No. 91160266
to application Serial No. 75761159
filed on July 23, 1999

‾‾‾‾‾‾

Barbara Solomon and Evan Gourvitz of Fross Zelnick Lehrman & Zissu, PC for Christopher Brooks

Marc A. Karlin of Karlin & Karlin, APLC for Creative Arts By Calloway, LLC

‾‾‾‾‾‾

Before Zervas, Kuhlke and Bergsman, Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Applicant, Creative Arts By Calloway, LLC, seeks

registration of the mark CAB CALLOWAY for services

identified in the application as:

> Retail stores, retail outlets and on-line retail store services featuring compact discs, records, video tapes, cassettes, digital video and audio discs, and other home entertainment related products; distribution of pre-recorded comedies, musicals and dramas on video tapes, cassettes,

digital video and audio discs, CD-ROM;
distribution of pre-recorded theatrical musicals,
comedies and dramas on video tapes, cassettes,
digital video and audio discs, CD-ROM; and
distribution of pre-recorded music, drama, comedy
and variety shows on video tapes, cassettes,
digital video and audio discs and CD-ROM, in
International Class 35; and

Entertainment services in the nature of multimedia
entertainment software production services,
scheduling of programs on a global computer
network; production and distribution of live music
concerts, comedy, and dramatic series; production
of live music concerts and live theatrical plays;
production of radio and television programs;
production of videotapes and sound recordings,
namely, phonograph records, pre-recorded audio
tapes, compact discs, videotapes, digital audio
tapes, compact disc videos, and laser discs;
production and distribution of motion pictures;
production of comedies, musicals and dramas;
scheduling television and radio programming;
production of music, drama, comedy and variety
shows; theatrical production of musicals, comedies
and dramas in International Class 41.[1]

Opposer, Christopher Brooks, opposed registration of applicant's mark on the grounds that, as used in connection with applicant's services, the mark so resembles opposer's previously used mark THE CAB CALLOWAY ORCHESTRA for live musical performances and audio and video recordings of these performances as to be likely to cause confusion, to cause mistake, or to deceive under Trademark Act Section 2(d), 15 U.S.C. §1052(d).

---

[1] Serial No. 75761159, filed July 23, 1999. The application is based on an allegation of a bona fide intention to use the mark in commerce under Trademark Act Section 1(b), 15 U.S.C. §1051(b).

Applicant filed an answer by which it denied the salient allegations of the notice of opposition.

The evidence of record consists of the pleadings herein; the file of the opposed application; the parties' "Stipulation as to Facts and Agreement to Submit Opposer's Testimony by Affidavit" (Stipulation); testimony, with exhibits, of Christopher Brooks, Kuni Mikami (professional musician and orchestra member), Troy Burton (Executive Director of the Eubie Blake National Jazz Institute and Cultural Center) and Monty Zullo (Broadway producer and performing arts manager), all submitted in affidavit or declaration form by stipulation; opposer's notice of reliance on printed publications, papers filed by applicant in support of applicant's opposition to opposer's prior motion for summary judgment in this opposition proceeding,[2] and third-party registrations; and applicant's notice of reliance on the Stipulation. Applicant also submitted under

---

[2] These papers consist of Applicant's Response to Opposer's Statement of Undisputed Material Facts and a declaration of Cabella Calloway Langsam. The papers appear to be opposer's file copies and not copies from the Board file. A party's file copies of documents filed with the Board are not proper matter for submission under notice of reliance. Osage Oil & Transportation, Inc. v. Standard Oil Co., 226 USPQ 905, 906 n.5 (TTAB 1985). It should also be noted that even if the Board's file copies were submitted as official records under notice of reliance they would not be competent to prove the truth of the matter asserted in those documents, and would merely show that the documents had been filed. However, applicant has not objected to these documents and, in its brief, applicant also relies on the Langsam declaration. In view thereof, we have considered the documents and accorded them appropriate probative value.

notice of reliance legal memoranda filed in a prior civil proceeding between the parties discussed below.

### THE PARTIES

Opposer is the grandson of Cab Calloway, the well-known musician who passed away in 1994. Opposer is also a musician and performs with his own ensemble under the name THE CAB CALLOWAY ORCHESTRA. Applicant was founded by Cab Calloway's widow, Zulme Calloway, and his daughters Chris Calloway and Cabella Calloway Langsam. *See infra*.

### EVIDENTIARY OBJECTIONS

By way of background, the parties were involved in the prior civil action Creative Arts by Calloway, LLC v. Christopher W. Brooks, No. 01 CIV. 3192 (BDP), *aff'd*, 48 Fed. Appx. 16, 2002 WL 31303241 (2nd Cir. 2002). In that case, applicant brought a trademark infringement claim against opposer for his use of the name Cab Calloway. The U.S. District Court for the Southern District of New York granted opposer's motion for summary judgment on the question of trademark infringement and denied applicant's motion for a preliminary injunction. In affirming that decision, the Second Circuit stated the following:

> Regardless of whether the name "Cab Calloway" acquired secondary meaning during the performer's lifetime, Creative Arts cannot prevail because any trademark assignment to Zulme Calloway would have been invalid. A trademark is merely a symbol of good will and cannot be sold or assigned apart from the goodwill it symbolizes... In the instant

4

case, Cab Calloway was not operating a going concern at the time of his death, precluding the transfer of a mark.

Creative Arts, 48 Fed. Appx. at 17-18.

Applicant seeks to introduce certain legal memoranda filed by opposer in that civil action and to rely on the following statements made in opposer's briefs:

If a name, regardless of how famous it is, refers primarily to the individual, it is not and cannot be protected as a mark.  The only personal names that are protected as valid marks are those that have acquired "secondary meaning," so that they are synonymous in the minds of the public with a specific ongoing business, or with the sole source of origin for all goods and services offered under that name.  (Opposer's brief as defendant in the appeal before the Court of Appeals for the Second Circuit attached as Exh. No. B to applicant's notice of reliance);

It is black letter law that personal names are merely descriptive and are protected only if, through usage, they have acquired distinctiveness and secondary meaning. (Opposer's brief on motion for summary judgment as defendant in the infringement case before the District Court for the Southern District of New York attached as Exh. No. C to applicant's notice of reliance); and

In order for plaintiff to have a legally protectable right in CAB CALLOWAY, Plaintiff must first establish that the name has acquired secondary meaning.  (Opposer's brief on motion for summary judgment as defendant in the infringement case before the District Court for the Southern District of New York attached as Exh. No. D to applicant's notice of reliance).

Opposer objects to the introduction of his prior statements in the legal memoranda "concerning whether Applicant's or its predecessors' purported use of 'Cab Calloway' *to refer to the individual Cab Calloway or his*

*works* was protectable *under the law of that circuit*" in the civil action as "irrelevant and immaterial" to this case. Br. p. 9 (emphasis in original). Opposer also argues that these "legal arguments" are not admissible by notice of reliance under any of the provisions relied upon by applicant. Applicant counters that these statements are relevant because they serve as admissions against interest "as Opposer admitted in a prior court proceeding with Applicant that the name of an artist is presumptively a personal name, and that to be protected as a trademark, personal names must have secondary meaning." Br. p. 7. Applicant argues further that "pursuant to the doctrine of judicial estoppel" opposer is estopped from "contending that the mark CAB CALLOWAY is inherently distinctive." Id.

We begin by noting that these briefs do not reflect that they were received by the District Court or Court of Appeals and, thus, may be merely applicant's file copies of the documents. As such, they are not properly introduced under a notice of reliance as official records and opposer's objection on that basis is sustained. See Hard Rock Cafe International (USA) Inc. v Elsea, 56 USPQ2d 1504, 1508 (TTAB 2000). See also Martahus v. Video Duplication Services Inc., 3 F.3d 417, 27 USPQ2d 1846, 1849 (Fed. Cir. 1993) (without documentation properly of record Court cannot assess inconsistent positions).

However, the issue of whether these are applicant's file copies or copies retrieved from the District Court and Court of Appeals was not specifically addressed by applicant and opposer in their briefing of this case. Therefore, to the extent these briefs are from the court's files and could be considered official records, we address opposer's further objections.

We first consider opposer's objection on the basis that these are legal arguments. Prior statements of law are not admissions of fact, and cannot serve as admissions against interest. See Interstate Brands Corporation v. Celestial Seasonings, Inc., 576 F.2d 926, 198 USPQ 151, 153-54 (CCPA 1978) ("But, because 'that confusion is unlikely to occur' is a legal conclusion, it cannot be an 'admission.' Facts alone may be 'admitted.' In reaching the legal conclusion, the decision maker may find that a fact, among those on which the conclusion rests, has been admitted; he may not, however, consider as 'admitted' a fact shown to be non-existent by other evidence of record; nor may he consider a party's opinion relating to the ultimate conclusion an 'admission.'").

The arguments made by opposer concerning applicant's asserted mark CAB CALLOWAY in defense of an infringement suit brought by applicant against him (i.e., that a personal name must have acquired distinctiveness before it can be

exclusively appropriated as a trademark) are opinions of law and not admissions of fact and thus cannot serve in this case as admissions against interest by opposer.

We next consider the objection on the basis that these arguments are irrelevant and judicial estoppel is not applicable. The doctrine of judicial estoppel serves to prevent an unfair result by prohibiting a party from asserting a position inconsistent from one taken in a prior proceeding, and its application lies within the discretion of the court. Boston Chicken Inc. v. Boston Pizza International Inc., 53 USPQ2d 1053, 1055 (TTAB 1999) (citing DataGeneral Corp. v. GSA, 78 F.3d 1556, 1565 (Fed. Cir. 1996)). The Board applies a seven factor test to determine whether it is appropriate in a given circumstance: (1) judicial acceptance of the previously asserted inconsistent position; 2) risk of inconsistent results; 3) effect of the party's actions on the integrity of the judicial process; 4) perception that the tribunal has been misled; 5) reliance by the opposing party; 6) prejudice to the opposing party's case as a result of the inconsistent position; and 7) the party against whom estoppel is invoked must have received some benefit from the previously taken position. Boston Chicken, 53 USPQ2d at 1055 (citing Harley v. Meonto Corp., 869 F.2d 1469, 10 USPQ2d 1138 (Fed. Cir. 1989) and Water

8

Technologies Corp. v. Calco Ltd., 850 F.2d 660, 7 USPQ2d 1097 (Fed. Cir. 1988)).

Under the circumstances here, however, judicial estoppel is not applicable because the parties are before a different tribunal (court v. board), applying different legal standards (secondary meaning required for personal names v. no secondary meaning required for personal names), to determine different rights (use v. registration). Thus, because of the distinction between the proceedings there will not be an improper effect on the integrity of judicial proceedings and there is no perception that the tribunal has been misled. Accordingly, opposer's objections to Exhibits B, C and D attached to applicant's notice of reliance are sustained.

We turn next to applicant's objections to certain evidence. Applicant objects to Exhibit No. 1 submitted under Mr. Brooks' testimony and Exhibits Nos. 3-11 submitted under the notice of reliance as "not relevant to Opposer's Section 2(d) opposition based upon his pre-July 23, 1999 activities." In addition, applicant objects to Exhibit No. 3 attached to Mr. Brooks' testimony as "inadmissible hearsay" and to Exhibits Nos. 14 and 15 under the Notice of Reliance as not relevant "as the document[s] concern registered, not common law, trademark[s]."

Applicant has already stipulated "to the admission into evidence without objection of the affidavit attached hereto as Exhibit B [Brooks' affidavit] and the exhibits thereto as part of Opposer's testimony in these proceedings." Stip. p. 1. Thus, applicant has waived its right to object to the admissibility of the exhibits attached to Mr. Brooks' testimony affidavit and its objections are overruled. We note, however, that Exh. No. 3 consists of a letter from a third party, and the probative value of this letter is limited to the extent that we cannot consider the statements therein for the truth of the matters asserted.

As to the exhibits submitted under the notice of reliance, the documents in Exhibits Nos. 3-11, which comprise printed publications dated after July 23, 1999, have limited probative value in that we cannot take the statements contained in the publications as establishing the truth of the matters asserted therein. Nonetheless, they are relevant, at a minimum, to show continued consumer exposure to opposer's asserted mark THE CAB CALLOWAY ORCHESTRA in connection with his name. With regard to Exhibits Nos. 14 and 15, third-party registrations for band names, e.g., COUNT BASIE ORCHESTRA, these documents have some relevance regarding the standard to be applied to personal name marks and the United States Patent and Trademark Office (USPTO) practice in determining

10

registrability of certain types of marks. As opposer states, "these exhibits are relevant, as they provide evidence of the distinctiveness of marks that include both the name of a famous historical band leader and the word ORCHESTRA." Br. p. 3. In view thereof, applicant's objections to these exhibits submitted under notice of reliance are also overruled.

### STANDING

As discussed below, opposer has shown that he has used the phrase THE CAB CALLOWAY ORCHESTRA in connection with live musical performances and as such has demonstrated a real interest in opposing registration of the mark CAB CALLOWAY for the identified services. See Ritchie v. Simpson, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); Jewelers Vigilance Committee, Inc. v. Ullenberg Corp., 823 F.2d 490, 2 USPQ2d 2021 (Fed. Cir. 1987); Lipton Industries, Inc. v. Ralston Purina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982). Thus, opposer has established his standing.

### LIKELIHOOD OF CONFUSION/PRIORITY

As noted above, the parties submitted a stipulation as to certain facts and as to the remaining issue to be resolved. In particular, the parties stipulated that "the sole issue before the Board in this opposition is whether Opposer can establish rights in THE CAB CALLOWAY ORCHESTRA prior to the filing date of the opposed application, which

11

is July 23, 1999." Stip. p. 1. As to the issue of

likelihood of confusion the parties stipulated that:

> THE CAB CALLOWAY ORCHESTRA and CAB CALLOWAY,
> considered in their entirety, are nearly identical
> in appearance, sound, connotation, and commercial
> impression. Stip. ¶11;
>
> Opposer's goods and services and the services set
> forth in the Application are identical or closely
> related. Stip. ¶12; and
>
> Should Opposer establish that its use of THE CAB
> CALLOWAY ORCHESTRA created rights that existed
> prior to July 23, 1999, then any application
> granted to Applicant for CAB CALLOWAY for the
> services set forth in its application would cause
> a likelihood of confusion with THE CAB CALLOWAY
> ORCHESTRA for the goods and services he offers for
> sale or sells in connection with that term. Stip.
> ¶14.

Thus, there is no dispute that the marks are nearly

identical and the goods and services are identical or

closely related. We, therefore, conclude that there is a

likelihood of confusion between the phrase THE CAB CALLOWAY

ORCHESTRA and applicant's proposed mark CAB CALLOWAY.

We turn then to the question of priority. The parties

have stipulated to the following facts:

> Opposer Chris Brooks is the eldest grandson of the
> internationally famous jazz musician Cab Calloway,
> who died in 1994. Stip. ¶1;
>
> Opposer performs and has performed with his
> musical ensemble THE CAB CALLOWAY ORCHESTRA (the
> "Orchestra") in the United States. Stip. ¶2;
>
> Opposer is the sole proprietor, musical director,
> and lead performer of the Orchestra. Stip. ¶3;
>
> Opposer uses THE CAB CALLOWAY ORCHESTRA in
> connection with the Orchestra's live musical

12

performances in the United States and has used it continuously from the date of adoption.  Stip. ¶4;

Opposer uses THE CAB CALLOWAY ORCHESTRA in connection with the sale of compact discs and videotapes in the United States and has used it continuously from the date of adoption.  Stip. ¶5.

Applicant Creative Arts by Calloway, LLC ("Creative Arts") is a Delaware limited liability company founded by its predecessor, Cab Calloway's widow, Zulme Calloway, and Cab Calloway's daughters Chris Calloway and Cabella Calloway Langsam.  Stip. ¶6;

On July 23, 1999, Applicant's predecessor filed intent-to-use application Serial No. 75/761,159 (the "Application") to register CAB CALLOWAY. Stip. ¶7; and

The earliest priority date upon which Applicant can and does rely for the services set forth in the Application, and for purposes of this opposition, is the date it filed the Application, July 23, 1999.  Stip. ¶9.

Thus, what remains for our determination is the question of when opposer first began use of THE CAB CALLOWAY ORCHESTRA and if any use by opposer prior to July 23, 1999 was of a nature to establish prior rights sufficient to preclude registration of the applied-for mark by applicant.

The record shows that opposer first used THE CAB CALLOWAY ORCHESTRA in connection with a live musical performance on December 19, 1998.  Opposer performed under the name THE CAB CALLOWAY ORCHESTRA on at least three other occasions prior to July 23, 1999:  February, 1999 (Zullo Decl. ¶3); March 20, 1999; and May 19, 1999 (Mikami Decl. ¶¶4-5, Burton Decl. ¶4, Brooks Aff. ¶6).  At these

13

performances the orchestra's name was prominently displayed and opposer repeatedly referred to the orchestra as THE CAB CALLOWAY ORCHESTRA. See generally Mikami Decl. and Brooks Aff. In addition, at some of these performances opposer advertised and sold compact discs and videotapes of the band's performance bearing the name THE CAB CALLOWAY ORCHESTRA. Id.; Burton Decl. In March of 1999, opposer engaged a marketing consultant who distributed a press packet in that month, advertising and promoting opposer's band under the name THE CAB CALLOWAY ORCHESTRA to industry contacts, including Time Warner, William Morris and ICM. Zullo Decl. Since 1999, opposer has averaged "about twenty-four to forty concerts per year in the United States" and continues to sell his CDs and videotapes. Brooks Aff. ¶10.

Opposer asserts that the evidence of record establishes his prior service mark use or, in the alternative, trade name use or use analogous to trademark use.

There is no dispute that opposer used the phrase THE CAB CALLOWAY ORCHESTRA in connection with live musical performances, CDs and videotapes prior to July 23, 1999. Applicant argues, however, that these uses are not sufficient to establish rights in the name THE CAB CALLOWAY ORCHESTRA. More specifically, applicant argues that under common law "to be protected as a trademark, personal names must have secondary meaning." Br. p. 18. Applicant

14

contends that the evidence of record is not sufficient to find secondary meaning in opposer's alleged mark prior to applicant's filing date. In making this argument, applicant recognizes that "personal names which are not primarily merely surnames will be accepted for registration, published, and if not opposed and used, registered." Br. p. 19. Applicant further contends that "that departure from the common law benefits applicants, not opposers. Under Section 2(d), Opposer [sic] chosen weapon in this proceeding, he must assert a prior registration or common law right. He has no prior registration, so he is bound by the common law which, as Opposer pointed out repeatedly in prior litigation between the parties, demands secondary meaning before personal names may be asserted as trademarks." Br. p. 19.

As to trade name use, applicant argues that the evidence is insufficient to show that "he used the name THE CAB CALLOWAY ORCHESTRA in a manner which identified his services to the public." Br. p. 23.

A personal name mark, unless it is primarily merely a surname, is registrable on the Principal Register without a showing of secondary meaning, and thus is deemed to be inherently distinctive under the Lanham Act if the record shows that it is used in a manner that would be perceived by purchasers as identifying the services in addition to the

person.  Compare In re Carson, 197 USPQ 554 (TTAB 1977) (JOHNNY CARSON registrable as a service mark where name featured in advertisements for services) and In re Ames, 160 USPQ 214 (TTAB 1968) (NEAL FORD & THE FANATICS registrable as a service mark where name was used on advertisements that prominently featured a photograph of the group and gave the name, address and telephone number of the group's booking agent), with In re Mancino, 219 USPQ 1047 (TTAB 1983) (BOOM BOOM would be viewed by the public solely as applicant's professional boxing nickname and not as an identifier of the service of conducting professional boxing exhibitions) and In re Lee Trevino Enterprises, Inc., 182 USPQ 253 (TTAB 1974) (LEE TREVINO not registrable where specimens of use only identify a famous golfer not services).  See also TMEP Section 1301.02(b).  Indeed, applicant's own application for the mark CAB CALLOWAY, which is a personal name, was not refused registration as merely descriptive, and was forwarded to publication by the USPTO without any requirement for a showing of acquired distinctiveness.

The requirement that pertains to personal names under the Lanham Act is found in Section 2(c) which requires written consent from living individuals.[3]  In those cases

---

[3] Personal names are also addressed in Section 2(a) of the Lanham Act which provides:  No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it - (a) Consists of or comprises ... matter which

where the name does not identify a living individual it is USPTO practice to require a statement to that effect. For example, the subject application includes the statement "The name Cab Calloway does not identify a living individual."

Applicant cites to various authorities that personal name marks are merely descriptive and not entitled to protection absent a showing of secondary meaning. However, applicant has not cited to any prior decisions of the Board or of its primary reviewing court in which this proposition has been stated or followed, and we are aware of no such decisions.[4] For the reasons discussed below, we are not

---

may disparage or falsely suggest a connection with persons, living or dead...or bring them into contempt, or disrepute. However, that issue is not before us.

[4] We note that the Seventh Circuit recognizes some limitation to the general requirement that secondary meaning be shown for a personal name, for such name to be protectible in an infringement case focusing on use, rather than registration of the mark. In Peaceable Planet Inc. v. Ty Inc., 363 F.3d 986, 70 USPQ2d 1386, 1389-90 (7th Cir. 2004), the court stated:

> The "rule" that personal names are not protected as trademarks until they acquire secondary meaning is a generalization, and its application is to be guided by the purposes that we have extracted from the case law. When none of the purposes that animate the "personal name" rule is present, and application of the "rule" would impede rather than promote competition and consumer welfare, an exception should be recognized. And will be; for we find cases holding, very sensibly – and with inescapable implications for the present case – that the "rule" does not apply if the public is unlikely to understand the personal name as a personal name. [citations omitted] The personal-name "rule," it is worth noting, is a common law rather than statutory doctrine. All that the Lanham Act says about personal names is that a mark that is "primarily merely a surname" is not registrable in the absence of secondary meaning. There is no reference to first names... The extension of the rule to first names is

17

persuaded that we should follow the authorities cited by applicant on this issue.

The early cases interpreting the Lanham Act reviewed the differences between the Trade Mark Act of 1905 and the Lanham Act, concluding that while surnames continue to require a showing of secondary meaning under the Lanham Act, personal or full names do not. In finding "Andre Dallioux" registrable for traveling bags and ladies' hand bags because it comprised an entire name of an individual, the Commissioner stated:

> Under the provisions of the Trade Mark Act of 1905, "registration of a mark which ... consists merely of the name of an individual" was prohibited unless it was printed in such a manner as to comply with certain exceptions set out in section 5 of that Act. The Act was further construed to prohibit registration of marks consisting of surnames, refusal being based upon the construction that a surname constituted the major portion of an individual name, and accordingly was within the prohibition as to the "name of an individual" above quoted...Thus under the Act of 1905, registration of marks consisting of names of individuals, including surnames, was prohibited. In the corresponding section of the Trade Mark Act of 1946, section 2(e), there is no reference to "merely the name of an individual" in specifying the types of marks which shall be refused registration on account of their nature and, in place thereof, section 2 provides that "no

a judicial innovation and so needn't be pressed further than its rationale, as might have to be done if the rule were codified in inflexible statutory language. Notice too the limitation implicit in the statutory term "primarily."... Treating the personal-name rule as a prohibition against ever using a personal name as a trademark (in the absence of secondary meaning) would lead to absurd results, which is a good reason for hesitating to press a rule to its logical limit, its semantic outer bounds.

> trade mark ... (3) is primarily merely a surname."
> It thus continued to require refusal of
> registration of marks which consisted merely of
> surnames, which the court referred to as "the
> significant portion of the name," in The American
> Tobacco Co. v. Wix, supra, but eliminated the
> requirement of refusal of one consisting of "the
> name of an individual." To refuse registration of
> the mark as shown in the drawing would be in
> effect to continue the rule of the Act of 1905,
> even though the prohibition against registration
> of a mark consisting of the name of an individual
> (which included surnames but was not restricted
> thereto), no longer remains in the law.... It is
> to be noted that the mark presented is used as a
> trade mark. A different situation might well be
> presented in the event an individual name was not
> used as a trade mark, as for example, if it were
> used merely as a part of the name and address of
> the manufacturer rather than as a trade mark.

Ex Parte Dallioux, 83 USPQ 262, 263 (Comm'r 1949). See also

Ex Parte Rivera Watch Corp., 106 USPQ 145 n. 9 (Comm'r 1955)

("The discussions also indicate an intent to permit an

applicant to register his own full name, but the language

finally adopted in Sec. 2(e) does not necessarily permit

such a broad interpretation. When read in conjunction with

Sec. 2(c), however, such intent probably was expressed,

although in a somewhat negative manner.")

The USPTO continues to view personal names as

inherently distinctive and registrable on the Principal

Register. See In re J.J. Yeley, 85 USPQ2d 1150 (TTAB 2007)

(J. J. Yeley identifies an individual and, therefore, is not

primarily merely a surname).

We see no logical basis for holding that a personal

name mark which is inherently distinctive for registration

purposes must nonetheless be shown to have acquired secondary meaning before it can be relied upon by an opposer in an opposition proceeding. Thus, we reject applicant's argument regarding opposer's alleged failure to establish secondary meaning in his mark because we consider the mark to be inherently distinctive.

To rule otherwise would be in direct conflict with the basic underpinning of trademark law in the United States, which is that rights are obtained through use and not by being the first to file an application. If we applied two different standards it would judicially create a first to file system for personal names. Thus, what cannot be reconciled is the application of different standards to the plaintiff and defendant in these circumstances. Either personal name marks require secondary meaning, in which case we must remand the application for examination under that standard, or they do not, in which case opposer need not show secondary meaning. It is a settled interpretation of the statute, followed by the USPTO for over 50 years, that personal name marks are inherently distinctive under the Lanham Act and we continue to follow that interpretation. We hold that when a plaintiff is asserting prior rights

based on a personal name, not a surname, the personal name trademark is inherently distinctive.[5]

In view thereof, opposer's mark THE CAB CALLOWAY ORCHESTRA, taken in its entirety, is inherently distinctive; and the record demonstrates opposer's use of this phrase as a service mark in connection with live musical performances prior to applicant's filing date.[6]

In addition, we find that the record also supports use as a trade name and, again, opposer's use as a trade name is prior to applicant's filing date.[7] "An organization need only to have used a name or acronym in a manner that identifies the company by that name or acronym to the public." National Cable Television Association Inc. v. American Cinema Editors Inc., 937 F.2d 1572, 19 USPQ2d 1424, 1428 (Fed. Cir. 1991). See also West Florida Seafood Inc. v. Jet Restaurants Inc., 31 F.3d 1122, 31 USPQ2d 1122, 1665

---

[5] In view of the above, we do not reach opposer's argument that CAB CALLOWAY is an historical name.

[6] In view of our decision regarding opposer's service mark use we do not address the issue of whether the use in connection with opposer's CDs and videotapes was sufficient to establish trademark rights prior to applicant's filing date. See generally TMEP Section 1202.08 (Title of a Single Work). See also Herbko International Inc. v. Kappa Books Inc., 308 F.3d 1156, 64 USPQ2d 1375 (Fed. Cir. 2002).

[7] Although opposer did not specifically plead trade name rights in the phrase THE CAB CALLOWAY ORCHESTRA, both parties proceeded as if opposer had done so. We deem the pleadings amended to conform to the evidence under Fed. R. Civ. P. 15(b), that is, to specifically include a claim of trade name rights in the phrase THE CAB CALLOWAY ORCHESTRA.

(Fed. Cir. 1994) ("In this case, the fact that a public health food inspector believed that the restaurant he was inspecting went by the name 'Fast Eddie's' is overwhelming evidence that West was identifying its restaurant to the public as 'FAST EDDIE'S.'")  The evidence of record clearly shows opposer identifying his band as THE CAB CALLOWAY ORCHESTRA to the public.  See Mikami, Burton and Zullo declarations; see also Brooks Aff. Exh. No. 2 (contracts between the venues and Chris Brooks and The Cab Calloway Orchestra).

As part of our finding above, we have determined that opposer "developed a trade identity," in THE CAB CALLOWAY ORCHESTRA through his use of this phrase as a trade name. Otto Roth & Company, Inc. v. Universal Foods Corporation, 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981).  However, opposer asserts that "to serve as a bar to registration, a trade name need not be inherently distinctive, nor must it have acquired any secondary meaning."  Reply Br. p. 9.  In support of this proposition opposer relies on Alfred Electronics v. Alford Mfg. Co., 142 USPQ 168, 172 (CCPA 1964).  Alfred Electronics involved an interference where the Board found prior use of a trade name that consisted of a surname sufficient to establish prior use.  In affirming the Board's determination, the Court of Customs and Patent

Appeals (CCPA), the predecessor to the Court of Appeals for the Federal Circuit (Court), stated:

> Under Section 2(d), a trademark is not entitled to registration where it so resembles a mark or trade name previously used by another as to be likely to cause confusion, or to cause mistake, or to deceive. That section does not specify that a trade name must be inherently distinctive or that it must have acquired a secondary meaning to be effective as a bar to registration and we find no basis for adopting an interpretation imposing such a requirement.

The CCPA earlier articulated this idea in In re Lyndale Farm, 186 F.2d 723, 726, 38 CCPA 825 (CCPA 1951):

> A trade name may be descriptive, generic, geographic, common in a trade sense, personal, firm or corporate. A trade-mark's function is to identify and distinguish a product, whereas a trade name's function is to identify and distinguish a business.

The Lanham Act defines "trade name" as follows:

> The terms "trade name" and "commercial name" mean *any* name used by a person to identify his or her business or vocation. Trademark Act § 45, 15 U.S.C. §1127 (emphasis added).

This definition is distinct from the definition for trademark which includes the phrasing "identify and distinguish" and "to indicate the source."

Since Alfred Electronics, the Federal Circuit issued its decision in Otto Roth, wherein the Court stated:

> [T]he opposer must prove he has proprietary rights in the term he relies upon to demonstrate likelihood of confusion as to source, whether by ownership of a registration, prior use of a trade name, or whatever other type of use may have developed a trade identity.

Id. at 43.

In its decision, the Court specifically "exlud[ed]...other means of trade identification" and "focus[ed] on trademarks."  Id. at 44.  However, the Court stated that:

> [the] proper focus of §2(d) is not on "mark" or "trade name," but upon the phrase, "likely *** to cause confusion, or to cause mistake, or to deceive" [and] confusion, or a likelihood thereof, is not recognized where one claiming to be aggrieved by that confusion does not have a right superior to his opponent's, or where he has not proved that that which he claims identifies him as the source of goods or services actually does so.

Id. at 44.

Shortly after the Otto Roth decision issued, the Board had occasion to address this issue in the context of trade name use.  In Fluid Energy Processing & Equipment Co. v. Fluid Energy, Inc., 212 USPQ 28 (TTAB 1981) the applicant sought to register "FLUID ENERGY" and opposer brought a claim of likelihood of confusion under Section 2(d) and asserted prior trade name use of "Fluid Energy" to establish its priority.  In citing Otto Roth, the Board stated:

> In those situations on which a party relies upon trade name use in support of its claim of damage, as in the case of reliance on a trademark or service mark, the trade name, per se, or the salient feature of the trade name must be of such a nature that the use thereof by the opposer would have been sufficient to create a proprietary right therein, namely, an association by the applicable trade of the name or term exclusively with opposer and its products.  As previously indicated, without such an association, the likelihood of

24

confusion would appear to be remote, if not nonexistent.

Id. at 35.

The Board then proceeded to find that "Fluid Energy" was an "apt or common descriptive term" and, thus, opposer failed to establish trade identity rights in "Fluid Energy," and, therefore, failed to establish any legal basis for its claim of damage or demonstrate any likelihood of confusion as to source. Id. at 36. See also Antillian Cigar Corp. v. Benedit Cigar Corp., 218 USPQ 187, 188 (TTAB 1983) wherein the Board stated:

> With the above concession, the question is raised whether the previous use in the United States of an admittedly descriptive trade name provides an opposer with standing to claim damage based on Section 2(d) of the Trademark Act from registration of a confusingly similar mark for identical goods. In our opinion, trade name rights cannot in our law stand on a higher pedestal of protection than that which has been erected for marks. In Otto Roth, at 209 USPQ 45 the Court above mandated that a secondary meaning showing was required in the case of the admittedly descriptive term 'BRIE NOUVEA' used in the nature of a mark in the circumstances of that case. Accordingly, use of a term as the salient part of a trade name which is primarily geographically descriptive of the products in connection with which it is used cannot endow its user with standing to oppose registration of a mark believed to be confusingly similar thereto, absent a showing that such term has acquired a secondary meaning indicating the source of those goods.

More recently the Court in Hoover Co. v. Royal Appliance Mfg. Co., 238 F.3d 1357, 57 USPQ2d 1720 (Fed. Cir. 2001) stated:

25

> Hoover, as the party opposing registration on the basis of likelihood of confusion with its own mark, must establish that "Number One in Floorcare" is distinctive of its goods either inherently or through the acquisition of secondary meaning.  See Towers v. Advent Software, Inc., 913 F.2d 942, 16 USPQ2d 1039, 1041 (Fed. Cir. 1990).  Hoover's attempt on appeal to characterize its slogan as a trade identity does not relieve it of the burden of establishing distinctiveness.  See id. at 946, 16 USPQ2d at 1041.  "[T]rade identity rights arise when the term is distinctive, either inherently or through the acquisition of secondary meaning."

Thus, while Lyndale Farm and Alfred Electronics have not been overruled, we must read them in conjunction with subsequent case law that clearly requires opposer to have at least a "superior" right.  In view of our finding that personal names are inherently distinctive, opposer has established its "superior right" through prior trade name use.

Finally, applicant's attempt to tack on purported prior use to establish prior common law rights is in direct contradiction to the stipulation it signed whereby applicant stipulated, as fact, that the earliest date upon which it may rely is July 23, 1999.  Applicant has not shown good cause to be relieved of this stipulation and such withdrawal made at briefing, after trial, would unfairly prejudice opposer.  See American Honda Motor Co., Inc. v. Richard Lundgren, Inc., 314 F.3d 17 (1st Cir. 2002) (citing New Hampshire v. Maine, 532 U.S. 742 (2001)).  In view thereof, we hold applicant to that stipulated fact.

We note, however, even if we were to allow applicant to withdraw that stipulation, the evidence of record is not sufficient to find that there was prior use, not abandoned, which applicant could tack on to its filing date. Proof of a date of use earlier than that asserted in the application must be established by clear and convincing evidence, because of the change of position from one "considered to have been made against interest at the time of filing of the application." Hydro-Dynamics Inc. v. George Putnam & Co., 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987).

Applicant states that it "holds common law rights in the trademark CAB CALLOWAY for sound recordings." The only evidence of record pertaining to any possible prior rights or use is in the form of Ms. Cabella Langsam's declaration submitted in support of an earlier summary judgment motion that opposer included in its notice of reliance during its testimony period. The declaration includes the following statements:[8]

> 3. Over the course of my father's 60-year career, he authored or co-authored over one hundred compositions including the hit Minnie the Moocher, which features the popular "hi-de-hi-de-hi-de-hi/ho-de-ho-de-ho-de-ho" refrain. My father also released numerous records and record albums of his recorded music, many of which are still in circulation today...
>
> 15. When Cab Calloway passed away in 1994, he bequeathed to my mother, Zulme, all his property,

---

[8] We note the declaration was entered under opposer's notice of reliance without any of the referenced exhibits.

real personal and mixed, of whatever kind "including all royalties and residuals or other payments or rights to payment for the reproduction of my performances or any songs or lyrics or both in which I have any ownership or other rights" as well as all intellectual property rights he possessed.

17.  In December 2000, my mother, my sister Chris Calloway, my husband and I formed Creative Arts by Calloway, LLC (hereinafter "CABC") to manage, promote, license and otherwise deal with the rights associated with the name, likeness, voice, and intellectual property rights belonging to Cab Calloway.  I am the Managing Partner of CABC.  My mother assigned all of her interests in my father's intellectual property, including all trademarks and service marks and associated goodwill, to CABC.

18.  One of CABC's predecessor[s] in interest, Calloway Entertainment, granted a trademark license to Gear Ink to manufacture and sell T-shirts bearing the CAB CALLOWAY trademark.  Gear Ink currently submits royalty checks to CABC as consideration for this license, and it has been sending such checks to my mother since at least 1996.

19.  As set forth above, CABC by and with its predecessors in interest and affiliated entities, has used the CAB CALLOWAY mark in connection with a variety of goods (e.g., sound recordings, clothing, and school supplies) and services (e.g., production and presentation of musical and theatrical performances, educational services, and scholarship awards) since long prior to Opposer's first use of THE CAB CALLOWAY ORCHESTRA.

Opposer's Notice of Reliance, Exh. No. 13.

These statements are not sufficient to establish by clear and convincing evidence any trademark rights in the name CAB CALLOWAY for sound recordings that predate applicant's filing date.  Applicant contends that "[a]s the person responsible for the quality of the sound for the

28

songs being recorded, Mr. Calloway owned the trademark right in the CAB CALLOWAY designation in connection with sound recordings." Br. p. 26. However, it is not clear what, if any, trademark rights Mr. Calloway owned to bequeath. There is simply no evidence from which to make any conclusions on this issue. There is no evidence that at the time of his death Mr. Calloway owned the rights to those recordings or exercised control over those recordings or use of the name CAB CALLOWAY in connection with those recordings. In addition, we note the following statement from the decision in the parties' civil action:

> Creative Arts argues that Cab Calloway transferred his entertainment business to Zulme Calloway, because retailers continue to sell his music and audiences can watch his television and movie appearances. However, it is undisputed that various record companies own the rights to the masters of Cab Calloway's songs, and there is no evidence that Creative Arts owns the rights to any of Cab Calloway's public appearances.

Creative Arts, 48 Fed. Appx. at 18).

At a minimum, this statement serves to undermine any possible inference of trademark rights in sound recordings that could be drawn from the Langsam Declaration.[9]

---

[9] In view of our finding above, we do not reach the question of whether sound recordings are sufficiently related to production of sound recordings for purposes of tacking. See In re Baroid Drilling Fluids Inc. v. Sun Drilling Products, 24 USPQ2d 1048 (TTAB 1992); Big Blue Products Inc. v. International Business Machines Corp., 19 USPQ2d 1072 (TTAB 1991). Tacking is permitted only in "rare instances." Van Dyne-Crotty Inc. v. Wear-Guard Corp., 926 F.2d 1156, 17 USPQ2d 1866, 1868 (Fed. Cir. 1991).

In view of the above, opposer has established that he is the prior user of the service mark and trade name THE CAB CALLOWAY ORCHESTRA.

Accordingly, because there is a likelihood of confusion and opposer has established prior use, opposer has proven his claim under Section 2(d).

**Decision**:  The opposition is sustained.